Thank you, your honor. Good morning. May it please the court. My name is Jerry Flanagan of Consumer Watchdog for Appellants, and I'd like to reserve two minutes for rebuttal. We'll try to help you, just keep your eye on the clock. Will do. Thank you. HIV patients can survive their disabling condition as long as they have ongoing and reliable access to their antiviral medications. The move to mail-only delivery of HIV medications put appellants' lives at risk. Routine delivery delays and missed dosages result in an increased viral load for HIV patients, threatening serious health consequences, and there is no monitoring of life-threatening drug interactions associated with HIV medications. We are here today because the district court committed three errors. First, the prescription drug benefit as a whole is the benefit at issue. Second, the limitations imposed by the mail-order program deny meaningful access to the broader prescription drug benefit. And third, because there is a loss of meaningful access, appellants seek a reasonable accommodation that would not upend the health insurance system. Appellants seek the same benefits, the same network pharmacies, and the same pharmacists other enrollees have. When I answer this, I actually, this is anecdotal, I actually go to CVS. And when I go there and I have a new prescription or a change in a prescription, they ask me whether I want to speak with the pharmacist. But it's right out there in the open. I mean, you know, there's no secrecy to it. There's a little kind of a dividing area there the pharmacist can speak in. If you're listening, you can hear everything that's being said. As I understand this, one of the things you're concerned about, with some reason, is that this is a confidential thing. You don't want people to feel chagrined about personal serious medical conditions. But other than the consultation right with the pharmacist, which I've described, at least what I've observed, what other benefit is there that, in quotes, non-compromised patients In other words, what does one have that your clients don't have? Thank you, Your Honor. There's two primary benefits in addition to the privacy concern. One is that because the CVS in these instances of HIV medications is a drop shipment locale, like an Amazon locker, they are subject to delivery delays. And the benefit there is loss of access to consistent delivery. Secondly, because the drug is a drop shipment and an Amazon locker at the CVS pharmacy, as we allege, the pharmacists there don't have any expertise or any consultations to provide anyway, because they didn't make up the drug. And additionally, obviously, there are privacy concerns. Isn't that really your only complaint in this case? It seems to me that if they offer you an option, you can either obtain the drugs by mail or at a location. If that location were your neighborhood pharmacy, you would have no complaint in this case, would you? No, Your Honor. Therefore, the mailing is really quite irrelevant to this case. The question is whether or not you're somehow being denied a right by being required to go to this other location to pick up the drugs rather than your neighborhood pharmacy, correct? No, Your Honor. The mail order pharmacy, the mail order aspect of it, because it's only mail delivery either to the drop shipment or the home, creates these delivery delays that would not exist in the wider network. CVS's role as a PBM is to set up a list of in-network pharmacies, include both CVS and others. The problem is, is that our clients... You're missing my point. You're missing my point. Mailing to the home is not your problem here. The problem you're complaining about is that your alternate place to pick it up is not the pharmacy, correct? Because if, by definition, the option offered you were either have it mailed to your home or you can pick it up at the pharmacy, you would have no problem, would you? The problem is that because the pharmacy, the specialty pharmacy that exists somewhere outside of California and away from where the Palins live, only ships to both CVS and the home. That's the problem. It doesn't matter whether it's just... That's my point. You would have no problem if the specialty pharmacy shipped the drugs to your local pharmacy, would you? No, it's not a shipment issue when it's... Yes. Okay. We're missing each other here. So we need to focus in this case on what disadvantages are placed on your clients by having to go to what you call the drop box location. They are not being disadvantaged by also having access to mail at home. Your problem is that the place that they have to go to pick it up, if that's the option they choose, is not the equivalent of a pharmacy. Is that fair? I think I'm following you, Your Honor. I mean, the difference is that because of the restrictions imposed by the mail order pharmacy, whether it goes to the home or to a physical location, that restricts access to the broader benefit, which denies meaningful access. What restricts the benefit here is that when you go to the drop box location, you do not have the same access to services from a pharmacist that you might had you gone to your local pharmacy. That as well as the privacy concerns that wouldn't exist when you're going to an adjunct. Yeah, that may or may not exist, but we're at the pleading stage. So my question is, having said that, and that's why I want to get to what the important part of the case for me. If you have access to pharmacists by telephone, after you pick up your drugs at the drop box location, why isn't that the equivalent of having access to them in person at the pharmacy? Because as we allege in the complaint, Your Honor, appellants have no access to a pharmacist over the phone, despite the advertisements of CVS. That's very well said for all five appellants. There's no access to a pharmacist over the phone or at the location. In addition, you know, do we take into account, again, we know we're at the pleading stage here, but the reality is any CVS customer has the right, and I forget which one it is. I think it's when you select number two or number three, you can speak to the pharmacist. It's available to the general public. So why couldn't your client arguably do that? Because as we allege in the complaint, the experience of the appellants is that because the drug is drop shipped and not actually like a normal prescription put together by the pharmacist at the location, the pharmacists that are at the location have no knowledge of the drug. They don't know. They don't. They didn't put it together. They literally take it out of the Amazon box and hand it over. They have no they don't have any of the knowledge or the information to provide the counseling. That's what the complaint is. But in the pharmacy, each of the CVS prescriptions has a description on there of what it is, the the dosage and the like. It also would have the required description as to basically it's a Merck manual that accompanies each of these things that tells you what the possible side effects are and this is something a person could call the pharmacist and say, this is what I've got here under this program from CVS. I'm having this concern, this problem. Will you help me? My understanding is that the general public has that right. Is that incorrect as far as the reality here? Well, the general public outside the program can ask questions and the pharmacist that is available there can answer the questions. But if your program is affiliated with CVS, why can't they also ask this? They can ask the question, but there's no response because the pharmacist that's standing there in front of them didn't put the drug together and doesn't have the answers. And in addition to in a very important piece, Your Honor, is that because the way the specialty pharmacy works, where the drugs are drop shipped and then the non-HIV drugs are picked up separately, no one at CVS has the ability to look at potentially life-threatening drug interactions between, for example, anti-psychotic medications, which are common for HIV patients and the HIV medications. There's no tracking of that whatsoever because CVS doesn't have any knowledge about the non-HIV prescription drugs that our appellants take. And I would note that these. Just a quick question. Are you are you saying that unless a pharmacist fills the order that they they are not in a position to counsel a patient about the drugs that they're dispensing? Well, I think it's probably related to that, Your Honor. It's that the HIV medications have been pulled away from the physical location pharmacies and dealt with in an external place. And that's where the expertise of those medications is now centralized. The individuals that are now handing the pharmacists that are handing drugs across at the pharmacies don't have any information about them. And we plead that in detail. That's the difference. But but but but but but the does have access to those specialty pharmacists by phone, don't they? They do not. And that's what we plead in detail on the complaint. They're not available over the phone. That's the problem among among the even if and they're not. And in addition to that lack of access to the pharmacist, there is because CVS treats these HIV medications separately than any other prescriptions you pick up. There's no checking of the drug interactions. And I gather that this this claim is based upon your view of a disparate treatment, right? Correct. Oh, no. Disparate impact, Your Honor. Disparate impact. I apologize. So in this case, my understanding is that there are a lot of these specialty pharmacy situations, not just HIV. Would that make any difference to your perspective about a disparate impact? There are a lot of... Let's say there were 10 other programs designed to save money to CVS, but also to the company sponsoring it or the people buying it. If there were 10 other programs or 10 other kinds of medical conditions, would there be a disparate impact here? Absolutely, Your Honor. Disparate impact looks at whether or not solely because of the disability, in this case, HIV positive nature of our clients, that the meaningful access was denied. And this was an error of the district court. The district court had, well, because other illnesses are included in the program, no one is disparately impacted solely because of the HIV status. In other words, two disabilities are impacted. But that's obviously not the law under 504. For example, this court's decision in Rhodey v. Bonta, in Rhodey, there were multiple disabilities affected by the discriminatory closing, disproportionately harmed by the closing of the hospital. What impact does Alexander v. Sandoval from the Supreme Court have on our case law regarding disparate impact? None at all. I mean, in Sandoval, the issue was whether under Title VI of the Civil Rights Act, there was a disparate impact. The Blue Cross Blue Shield case in the Sixth Circuit incorrectly applied it to Section 504. This case has relied on Choate's analysis to find that under Section 504, there is a disparate impact. And the focus, as the court found in Mark H.V. Lemahieu, is the focus is loss of meaningful access. And that's what we're here about. Did Choate, Choate didn't actually find that there was a cause of action for disparate impact under the Rehabilitation Act. It sort of assumed it. Yeah. Well, I mean, we've sort of assumed it since. So my question is, is that issue resolved in this circuit? Absolutely, Your Honor, because what Mark H.V. What case, what case holds, what case holds over an objection by the other side that there's a disparate impact claim in a Rehabilitation Act context? Well, I would look at two. Tustin Unified, this court held, quote, it relied on Choate's construction of Section 504 that to a challenging, facially neutral policy on the grounds it has a disparate impact. The policy must have the effect of denying meaningful access. That's a Tustin Unified case. And then Mark H.V. Lemahieu. No, I understand. I understand what we said in both those cases. But did we hold in either of those cases that, see, in my view, although I would tend to agree with you on the merits if I had to address them, but in my view, we've never actually held. I think that there's a disparate impact claim under the Rehab Act. Am I wrong? Yeah, I think the court has correctly followed the Choate analysis and say disparate impact, disparate treatment. We want to protect against unintentional discrimination. But the focus, as in Choate and all the cases in the Ninth Circuit, is regardless of the predicate discriminatory act, the question is, was meaningful access denied? No, I understand. That was your answer to Judge Smith's question. My question is just a different one. I just don't know that we've ever held. This case presents a question that I don't think we've ever resolved, which is, is there a disparate impact claim under the Rehab Act? Your opponents say there isn't. Well, I would say what's critical for this case is just embracing the same meaningful access law that this court has recognized in Guaravis versus the City of Los Angeles College, Tustin, Unified, Crowder, that the question is meaningful access. And I agree the court has never specifically said there is a disparate impact. Mark H. Lemahieu is the closest. But I'm telling you that for our action, whether there's a disparate impact or not is not the issue, as Mark H. B. Lemahieu said. No, we're at the pleading stage. You've let's assume you've alleged a disparate impact. I don't I give you that for purposes of this question. My question is, does that state a cause of action under the Rehab Act? And I think the answer to that is we have to decide that, don't we? Well, the Rehab Act, we've never actually decided that the Rehab Act provides that cause of action. I think this is an opportunity for the court to do so. And they haven't explicitly. But for us to succeed, what you need to do is embrace the Crowder and Mark H. cases that say the question ultimately is loss of meaningful access. You don't actually need to reach, just like you haven't reached before, whether disparate impact exists. The question is whether there's a loss of meaningful access. That's what Chote was focused on. And I think your time is essentially gone here. We may or we may have additional questions for you. But let's let's now hear from CBI. Thank you, Your Honor. Craig Singer for CBS. And just for housekeeping, before we go on, Mr. Singer, could you either get a little closer to your mic or turn up your volume? You're very faint. Okay. Can you hear me better now? Yes. Okay. Terrific. So just as housekeeping judge, ideally before we start the clock, I'm going to be covering all the issues except ERISA. Mr. Eskenazi will cover ERISA if the court has any questions about ERISA. Understood. Okay. Very well. So Mr. Singer, why don't you proceed and then we'll look to Mr. Eskenazi for the ERISA point. Thank you, Your Honor. So plaintiffs are seeking to change the health coverage plans to give them additional prescription drug benefits that the plans don't provide. And the district court correctly held that the plaintiff's claims are foreclosed by a theory of liability would make designing a health coverage plan unworkable, and it would threaten the very structure of HMO and PPO networks. So I'd like to cover three points concerning the Affordable Care Act. First, plaintiffs allege a disparate impact, but there is no disparate impact claim for disability discrimination under the ACA by the Rehabilitation Act and the Sixth Circuit recently so held. Second, even assuming a disparate impact theory is actionable, plaintiff's allegations do not state a claim under the Supreme Court's decision in Choate because the plaintiffs are not being denied material access, meaningful access to a benefit the plan offers solely by reason of their disability. The benefit is the program for specialty medicines, which applies to everyone, not just persons with HIV. Counselor, taking what you say at face value, wouldn't that be an evidentiary question? I mean, we're at the pleading stage. They claim denial of meaningful access. But how do you show at this state that they, in fact, are not being denied meaningful access? So it's based on the allegations in the complaint, and there's also some plan documents that have been attached in response to the motions to dismiss. But I think it's clear from the complaint on its face that what they're challenging is that specialty medicine program, which is, they claim, different and inferior for them to a different benefit offered under the same plans for non-specialty medicine. So you can just look at the face of the complaint. You can see there's a benefit that they are getting, which is the specialty medicine program, and the benefit that they're not getting, which is the one they want. Didn't this change during the participation of the plaintiffs in this plan? In other words, there was a point in time when the plan, and I've gone through the plan documents, but there was a point in time where the plan gave them access to local pharmacies, correct? That's what they allege, your honor, that prior to the program. They allege that. And, you know, so we have to take that as true. And then at some point in time, CVS changed the plan. Well, the employer changed the plan, but yes. The employer changed. Well, the plan was changed to one that only provided specialty medications, either through home delivery or this pickup spot, correct? That's what they allege, yes. Was that after these folks became members of the plan? I believe that at least as to some of them, that is what they allege, yes. Okay. So, so really, one way or another, the plan changed for some of these people, correct? That's what they allege. Okay. So why, why then, I don't understand the argument, well, this is the plan they signed up for and they're trying to change it. You changed it. Well, the argument, your honor, is not that this is the plan they signed up for. It's the plan that their employer has purchased. It's the plan that their employer offers. And it's the employer's prerogative to offer a plan with a package of benefits. So even if the plan, even if the plan discriminates? No, your honor, but this, that's the subject. So, see, I don't understand. My difficulty is, I think we need to get to the merits of their question and get past the question of whether or not this is the plan that their employer adopted. The fact that their employer adopted it doesn't immunize it from review if it violates the law, does it? No, you look at the plans, the plan itself, and if it violates the law, it violates the law. Our point is, it does not violate the law. Okay. So I want to get to that point because to me, it's the crux of this case. The reason I want to focus on, I want to focus on the requirement that these folks go to delivery at home for the reasons I said before. It doesn't bother me. The question is whether or not they're being denied meaningful access to the benefit, because if they have to go pick it up, they do not have access to a pharmacist to explain interactions, et cetera. Address that for me, please. Okay. Well, so you need to start, I think, with what is the benefit. And the benefit is always defined by what the plan provides. That comes straight out of CHOKE, because the CHOKE court said that the Tennessee 14 day limitation on coverage for inpatient hospital stays was the benefit and it could not create a disparate impact as a matter of law. That was also at the motion to dismiss stage, even though it disproportionately burdened disabled persons. So the program here provides the same benefit to everybody who uses specialty medicines, whether they're HIV positive or not HIV positive. The benefit is you get the specialty medicine at in-network prices by mail or by picking up the prescription at the CVS pharmacy. It's facially neutral and there's nothing. Is everyone who gets is everyone who gets specialty medications disabled? No, not at all. Especially. Well, so there's a group of this. There's a group among those who get specialty medications who are disabled. And, you know, in advance, they're disabled because they have HIV. And so you've, in effect, treated them differently than able bodied people by requiring them to pick up specialty medications at a remote location. The fact that there may be other non-disabled people who also have to pick them up there doesn't really make a difference, does it? It does, your honor, because it's in a disparate impact analysis. You look at the benefit that's being provided and not just whether it has a disproportionate impact. And that's not just whether it has a disproportionate effect, but you look at whether it is has a disproportionate effect solely by reason of a disability. If it's a facially neutral policy, just like in Choate, the 14 day hospital stay limit was facially neutral, applied to everybody, but it had a much greater, according to the plaintiffs, impact on disabled persons. The specialty medicine formulary applies to everybody who takes a specialty medicine. Some of them are disabled. Many of them are not. There are many medicines on the specialty formulary, for example, contraceptives, asthma, psoriasis. There are there are many things for non-disabled. Also on the non-specialty formulary, many people who take non-specialty drugs are not disabled either. It is facially neutral. So you look. But you seem to be you seem to be describing the benefit being provided as merely the medication. Your friend says the benefit being provided is pharmacy services, which is to say not only the physical access to the medication, but advice from pharmacists about interactions, when to take it, etc. Isn't that the benefit that's being provided? Well, the benefit that's being provided is the package of products and services that go along with the specialty medicine. So, yeah, if the specialty, if the specialty formulary and the plan benefit comes with pharmacist access, then that's part of the benefit. If it doesn't, it isn't. It's clear from Choate that you don't look at whether the benefit provides the best care, whether it provides even whether it provides good care. You look at whether it provides the same care across the board to everybody getting the benefit. So here we actually think it provides great care and there is pharmacist access by telephone. The plaintiffs allege that they're having a hard time getting that. And I'm sorry to hear that. That's certainly if that's the case, it's not up to CVS standards, but it's not discriminatory. Everybody who is on who is getting specialty medicines through the plan, through that benefit, is subject to the same terms and conditions. And if you change that, if you're allowed to change that, then it will have enormous impacts on the way that that insurance is delivered in this country. Because can I ask you a hypothetical here? And to save your time, you don't need to tell me it's not the facts of this case. What if what if the only drugs being put in the this program were HIV drugs? Would your answer to all my questions be the same? I think it'd be harder then because then you would have a benefit that's been pretty narrowly defined to only apply to one protected group. So why does it matter then if you add a bunch of others? If you have something that would be discriminatory by itself, do you make it non-discriminatory by adding a bunch of other drugs to the program? You do, because that's what that's what a disparate impact claim is. You need to look at what the benefit is. I think in your hypothetical, the benefit, I think you'd be too narrowly defining the benefit if you if you said it was just HIV drugs, because then you would be allowing a subterfuge. And it would really be a disparate treatment claim, I think, your honor, not a disparate impact claim. I think when you have a facially neutral policy like this one, it's purely a disparate impact claim. You have to look at the chokes. Do you want to kind of wind up your presentation? We're getting close to Mr. Eskenazi's time. Let's uh, Judge Burgess has a question. No, no, go ahead. OK, so let me let me just wind up on the chokes stand. I mean, I think the reason that it's so important to treat the benefit as what the policy provides a package of benefits. And it's a tradeoff. It provides some things. It doesn't provide others. And it's a careful balance. And if you start requiring insurers to add benefits whenever somebody feels that they need them, then that means other benefits have to be reduced somewhere else or else the price of the plan is going to go up for the employer. And if every provision of a plan required consideration of impacts on disabled and it would be unmanageable, both at the plan design level and by the court. Folks will then have to review every plan provision. So, well, you want to give Mr. Eskenazi some time? You're into the last few minutes here. I thought I was into my own time. I'm sorry. No, no. It's out of the 15 minutes.  Yes. Thank you, Your Honor. Philip Eskenazi, our appellee, loves companies. And I'm speaking on behalf of the employer on a very narrow issue. Just one cause of action upon appeal against the employers, and that is for denial of benefits under ERISDA. And to state a claim for denial of benefits, you have to allege the existence of a specifically identified plan term that is allegedly being denied. It provides the benefit you're seeking that is allegedly being denied. Here, as Judge Chen properly found, they have not done that. They, in fact, allege the opposite, that they don't have a particular benefit and they're trying to expand the scope. And that was really the only way Judge Chen could rule because they didn't point to any provision that provided the benefit they're seeking. On appeal, they've raised a new argument and they're trying to say that, well, the plan wasn't properly amended. And we briefed that that argument has been waived and I won't waste my time on that. I think it's been thoroughly briefed. But I will say, as to Lowe's, they conceded that Lowe's properly amended the plan. So I think there is stop for making that argument in any event. I'd also like to point out, even under there, this amendment idea, they still haven't stated a claim for denial of benefits because they still have not pointed to a specific plan term at any time that provided the benefit they seek. They just presuppose that the plan enabled them to do something and then they say, you improperly amended that plan. Again, we never had an opportunity to address that at the trial court level. Notably, Judge Chen didn't rule on that because it wasn't properly before him. But for today's purposes, it still don't get there because they haven't identified any term at any time. I would also note, I think this claim seeking these benefits under ERISA is doomed on its face because employers don't even need to provide an ERISA plan and they're free to amend them under ERISA at any time for any reason. Both this court and the United States Supreme Court has held that. So I don't see any scenario where they could seek this type of rule and stick to it and force employers to provide these conditions under ERISA. Okay. Let me ask my colleague, do either of you have additional questions or any questions for Mr. Eskenazi? I don't know. I'm sorry, go ahead. I don't. Okay. You don't. Okay. All right. Very well. I think then let's ask whether either of my colleagues have additional questions for Mr. Flanig. If not, I think both sides have had an opportunity to make their arguments. We thank you for that, your extensive briefing. The case, we're not going to submit this case today. We have another case pending in our circuit that may have some bearing. And so we're going to withhold submission for the moment, but we will communicate with the parties on what happens in that regard. So we'll now move to the next and final case for argument in the day, which is Hawley versus Tektronik Industries of North America.
judges: M. Smith, Hurwitz, Burgess